JERALD D. AND JOAN C. MORRIS, ET AL.,[1] PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5589–74, 5619–74,     Filed September 18, 1978.
10237–75—10263–75.

[1]The following cases have been consolidated: Harold S. and Ruth S. T. Yang, docket No. 5619–74; Jack Roy and Bettylou Allgaier, docket No. 10237–75; Russell K. and Elizabeth S. Brunner, docket No. 10238–75; Stanley F. and Judith G. Brown, docket No. 10239–75; Thurman P. and Marguerite C. Chappell, docket No. 10240–75; Robert B. and Earlene D. Crouch, docket No. 10241–75; John J. and Elizabeth A. Harmon, docket No. 10242–75; Martin O. and T. Louise Halfhill, docket No. 10243–75; John P. and Beverly K. Hammel, docket No. 10244–75; Kenji and Jean S. Matsuda, docket No. 10245–75; Richard D. and Donna M. Matthews, docket No. 10246–75; Timothy W. and Karen E. Martin, docket No. 10247–75; Frank J. and Anna M. Sordello, docket No. 10248–75; DeWayne Spickler, docket No. 10249–75; Loretta Whipling (formerly Loretta Spickler), docket No. 10250–75; DeWayne Spickler and Loretta Whipling (formerly Loretta Spickler), docket No. 10251–75; Carl E. and Donna J. Westenskow, docket No. 10252–75; James J. and Margie W. Woo, docket No. 10253–75; Harold S. Yang, docket No. 10254–75; Wilfred K. and Charlene D. Anderson, docket No. 10255–75; James E. and Judy P. Barlow, docket No. 10256–75; Estate of Steven J. MacArthur, Deceased, Judith A. Pledger, Executrix, docket No. 10257–75; Judith A. Pledger (formerly Judith A. MacArthur), docket No. 10258–75; Estate of Steven J. MacArthur, Deceased, Judith A. Pledger, Executrix, and Judith A. Pledger (formerly Judith A. MacArthur, surviving wife), docket No. 10259–75; Judith A. Pledger and Bank of America, N.T. & S.A., Cotrustees of trust established by Article Four of Will of Steven J. MacArthur, docket No. 10260–75; Judith A. Pledger and Bank of America, N.T. & S.A., Cotrustees of trust established by Article Four of Will of Steven J. MacArthur, docket No. 10261–75; Judith A. Pledger and Bank of America, N.T. & S.A., Cotrustees of trust established by Article Five of Will of Steven J. MacArthur, docket No. 10262–75; Judith A. Pledger and Bank of America, N.T. & S.A., Cotrustees of trust established by Article Five of Will of Steven J. MacArthur, docket No. 10263–75.

*Clarence J. Ferarri, Jr., Edward M. Alvarez, Kent E. Olsen,* and *Timothy E. Brown,* for the petitioners.

*Edward P. Simpson* and *Warren N. Nemiroff,* for the respondent.

GOFFE, Judge: The Commissioner determined deficiencies in Federal income taxes of petitioners as follows:

| Petitioner | Docket No. | Taxable year | Deficiency |
|---|---|---|---|
| Jerald D. and Joan C. Morris ............... | 5589–74 | 1970 | $9,987.37 |
| Harlod S. and Ruth S. T. Yang ............ | 5619–74 | 1970 | 69,573.65 |
| Jack Roy and Bettylou Allgaier ........... | 10237–75 | 1970 | 6,051.89 |
| Russell K. and Elizabeth S. Brunner ..... | 10238–75 | 1969 | 251,324.00 |
| | 10238–75 | 1970 | 476,624.00 |
| | 10238–75 | 1971 | 5,407.00 |

| | | | |
|---|---|---|---:|
| Stanley F. and Judith G. Brown .......... | 10239–75 | 1970 | 104,213.00 |
| Thurman P. and Marquerite C. Chappell ..................... | 10240–75 | 1970 | 8,662.35 |
| | 10240–75 | 1972 | 2,541.04 |
| Robert B. and Earlene D. Crouch ......... | 10241–75 | 1969 | 200,796.47 |
| | 10241–75 | 1970 | 554,945.38 |
| John J. and Elizabeth A. Harmon ......... | 10242–75 | 1969 | 224,742.00 |
| | 10242–75 | 1970 | 536,628.00 |
| Martin O. and T. Louise Halfhill .......... | 10243–75 | 1969 | $68,514.00 |
| | 10243–75 | 1970 | 490,260.00 |
| | 10243–75 | 1971 | 13,273.15 |
| | 10243–75 | 1972 | 2,542.08 |
| John P. and Beverly K. Hammel .......... | 10244–75 | 1969 | 3,814.00 |
| | 10244–75 | 1970 | 45,792.00 |
| | 10244–75 | 1971 | 36,732.00 |
| Kenji and Jean S. Matsuda ................. | 10245–75 | 1969 | 7,607.69 |
| | 10245–75 | 1970 | 2,031.55 |
| Richard D. and Donna M. Matthews ..... | 10246–75 | 1970 | 40,630.00 |
| | 10246–75 | 1971 | 41,063.90 |
| Timothy W. and Karen E. Martin ........ | 10247–75 | 1970 | 108,310.96 |
| Frank J. and Anna M. Sordello ............ | 10248–75 | 1970 | 93,428.37 |
| | 10248–75 | 1971 | 11,620.00 |
| DeWayne Spickler ............................. | 10249–75 | 1971 | 1,335.56 |
| Loretta Whipling (formerly Loretta Spickler) ................ | 10250–75 | 1970 | 1,210.96 |
| DeWayne Spickler and Loretta Whipling (formerly Loretta Spickler) .... | 10251–75 | 1969 | 5,357.23 |
| Carl E. and Donna J. Westenskow ........ | 10252–75 | 1969 | 49,355.09 |
| | 10252–75 | 1970 | 10,464.65 |
| | 10252–75 | 1971 | 70,774.64 |
| James J. and Margie W. Woo .............. | 10253–75 | 1969 | 204,104.00 |
| | 10253–75 | 1970 | 521,231.84 |
| Harold S. Yang ................................. | 10254–75 | 1971 | 49,855.54 |
| Wilfred K. and Charlene D. Anderson ... | 10255–75 | 1970 | 62,305.24 |
| James E. and Judy P. Barlow .............. | 10256–75 | 1970 | 20,100.63 |
| | 10256–75 | 1971 | 1,831.22 |

| | | | |
|---|---|---|---|
| Estate of Steven J. MacArthur, deceased, Judith A. Pledger, executrix | 10257–75 | 1971 | 49,926.00 |
| Judith A. Pledger (formerly Judith A. MacArthur) | 10258–75 | 1971 | $28,103.00 |
| Estate of Steven J. MacArthur, deceased, Judith A. Pledger, executrix and Judith A. Pledger (formerly Judith A. MacArthur, surviving wife) | 10259–75 | 1969 | 10,392.01 |
| Judith A. Pledger and Bank of America, N.T. & S.A., cotrustees of trust established by Article Four of Will of Steven J. MacArthur | 10260–75 | 1969 | 10,392.01 |
| Judith A. Pledger and Bank of America N.T. & S.A., cotrustees of trust established by Article Four of Will of Steven J. MacArthur | 10261–75 | 1971 | 16,065.00 |
| Judith A. Pledger and Bank of America, N.T. & S.A., cotrustees of trust established by Article Five of Will of Steven J. MacArthur | 10262–75 | 1969 | 10,392.01 |
| Judith A. Pledger and Bank of America, N.T. & S.A., cotrustees of trust established by Article Five of Will of Steven J. MacArthur | 10263–75 | 1971 | 49,926.00 |

Upon joint motion of the parties, these cases were consolidated for trial, briefing, and opinion. Concessions having been made, only the following issues remain for our decision:

(1) Whether, on the dates stock options were granted to petitioners, the option price was less than the fair market value of the stock subject to the options;

(2) The fair market value of the optioned stock on the various dates when petitioners exercised their options;

(3) The controlling dates that stock options were granted to petitioners or their predecessors in interest;

(4) The extent to which petitioners Brunner, Crouch, Halfhill, Harmon, and Woo each owned more than 10 percent of the

outstanding stock of the corporation granting the options within the meaning of section 422(b)(7), I.R.C. 1954;

(5) Whether section 1.422–2(h)(1)(ii), Income Tax Regs., is valid; and

(6) Whether there was a modification of the terms of the stock option granted to Steven J. MacArthur by permitting the purchase price to be paid by a promissory note instead of cash.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached are incorporated by reference.

Petitioners filed Federal income tax returns as follows; the individual petitioners resided at the following locations and the corporate petitioners had their principal places of business at the following locations when they filed their petitions, all of which are shown in table I, pp. 964 and 965.

In the computer industry, one of the important functions is the storage of data which can be contained in a small area and which can be retrieved quickly. One system for storage providing direct access to the data was the disc pack which resembled a stack of phonograph records. It was first developed by International Business Machines, Inc. (IBM), and incorporated into its 360-series computer system.

An integral part of the disc pack system is the disc drive which resembles in appearance a record player which, by use of an "actuator," positions moving heads across the face of the disc pack to record and retrieve information. A disc drive unit receives its instructions from a central unit which, in turn, is instructed by the central system or processor.

Sometime in 1967, a group of IBM employees, petitioners John J. Harmon, Robert B. Crouch, James J. Woo, Martin O. Halfhill, and Russell K. Brunner, and Mr. John J. McNulty (hereinafter referred to as the technical founders) were dissatisfied with what they described as the IBM bureaucracy. They felt they could design, build, and market a disc drive unit superior to that marketed by IBM; thus, they decided to organize a corporation for such purposes.

In the late summer of 1967, petitioner Harmon and Mr. McNulty went to New York City in an attempt to attract and promote investment in the corporation they proposed to organize. They were unsuccessful in obtaining financial support

TABLE I

| Petitioners | Taxable year | Residence when petition filed | Return | Return filed |
|---|---|---|---|---|
| Jerald D. and Joan C. Morris | 1970 | Santa Clara, CA | Joint | IRS Center, Ogden, UT |
| Harold S. and Ruth S. T. Yang | 1970 | Santa Clara, CA | Joint | IRS Center, Ogden, UT |
| Jack Roy and Bettylou Allgaier | 1970 | Los Gatos, CA | Joint | IRS Center, Ogden, UT |
| Russell K. and Elizabeth S. Brunner | 1969 | Santa Clara, CA | Joint | IRS Center, Ogden, UT |
|  | 1970 | Santa Clara, CA | Joint | IRS Center, Ogden, UT |
|  | 1971 | Santa Clara, CA | Joint | IRS, Fresno, CA |
| Stanley F. and Judith G. Brown | 1970 | Cupertino, CA | Joint | IRS Center, Ogden, UT |
| Thurman P. and Marguerite C. Chappell | 1970 | San Jose, CA | Joint | IRS Center, Ogden, UT |
|  | 1972 | San Jose, CA | Joint | IRS, Fresno, CA |
| Robert B. and Earlene D. Crouch | 1969 | Los Gatos, CA | Joint | IRS Center, Ogden, UT |
|  | 1970 | Los Gatos, CA | Joint | IRS Center, Ogden, UT |
| John J. and Elizabeth A. Harmon | 1969 | Saratoga, CA | Joint | IRS Center, Ogden, UT |
|  | 1970 | Saratoga, CA | Joint | IRS Center, Ogden, UT |
| Martin O. and T. Louise Halfhill | 1969 | San Jose, CA | Joint | IRS Center, Ogden, UT |
|  | 1970 | San Jose, CA | Joint | IRS Center, Ogden, UT |
|  | 1971 | San Jose, CA | Joint | IRS, Fresno, CA |
|  | 1972 | San Jose, CA | Joint | IRS, Fresno, CA |
| John P. and Beverly K. Hammel | 1969 | San Jose, CA | Joint | IRS Center, Ogden, UT |
|  | 1970 | San Jose, CA | Joint | IRS Center, Ogden, UT |
|  | 1971 | San Jose, CA | Joint | IRS, Fresno, CA |
| Kenji and Jean S. Matsuda | 1969 | Saratoga, CA | Joint | IRS Center, Ogden, UT |
|  | 1970 | Saratoga, CA | Joint | IRS Center, Ogden, UT |
| Richard D. and Donna M. Matthews | 1970 | San Jose, CA | Joint | IRS Center, Ogden, UT |
|  | 1971 | San Jose, CA | Joint | IRS, Fresno, CA |
| Timothy W. and Karen E. Martin | 1970 | Los Altos, CA | Joint | IRS Center, Ogden, UT |
| Frank J. and Anna M. Sordello | 1970 | Los Gatos, CA | Joint | IRS Center, Ogden, UT |
|  | 1971 | Los Gatos, CA | Joint | IRS, Fresno, CA |
| DeWayne L. Spickler | 1971 | Los Gatos, CA | Individual | IRS, Fresno, CA |

| Petitioners | Taxable year | Residence when petition filed | Return | Returns filed |
|---|---|---|---|---|
| Loretta Whipling (formerly Loretta Spickler) | 1970 | Anaheim, CA | Individual | IRS Center, Ogden, UT |
| DeWayne and Loretta Spickler | 1969 | Los Gatos/Anaheim | Joint | IRS Center, Ogden, UT |
| Carl E. and Donna J. Westenskow | 1969 | Portola, CA | Joint | IRS Center, Ogden, UT |
|  | 1970 | Portola, CA | Joint | IRS Center, Ogden, UT |
|  | 1971 | Portola, CA | Joint | IRS, Fresno, CA |
| James J. and Margie W. Woo | 1969 | Saratoga, CA | Joint | IRS Center, Ogden, UT |
|  | 1970 | Saratoga, CA | Joint | IRS Center, Ogden, UT |
| Harold S. Yang | 1971 | San Jose, CA | Individual | IRS Center, Ogden, UT |
| Wilfred K. and Charlene D. Anderson | 1970 | San Jose, CA | Joint | IRS Center, Ogden, UT |
| James E. and Judy P. Barlow | 1970 | Las Vegas, NV | Joint | IRS Center, Ogden, UT |
|  | 1971 | Las Vegas, NV | Joint | IRS, Fresno, CA |
| Estate of Steven J. MacArthur, deceased, Judith A. Pledger, executrix | 1971 | San Jose, CA | Fiduciary | IRS, Fresno, CA |
| Judith A. Pledger (formerly Judith A. MacArthur) | 1971 | San Jose, CA | Joint[1] | IRS, Fresno, CA |
| Estate of Steven J. MacArthur, etc., and Judith A. Pledger | 1969 | San Jose, CA | Joint | IRS Center, Ogden, UT |
| Judith A. Pledger and Bank of America, N.T. & S.A., Cotrustees, etc | 1969 | San Jose/San Francisco, CA | Joint | IRS Center, Ogden, UT |
| Judith A. Pledger and Bank of America, etc | 1971 | San Jose/San Francisco, CA | Fiduciary | IRS, Fresno, CA |
| Judith A. Pledger and Bank of America, etc | 1969 | San Jose/San Francisco, CA | Fiduciary | IRS Center, Ogden, UT |
| Judith A. Pledger and Bank of America, etc | 1971 | San Jose/San Francisco, CA | Fiduciary | IRS, Fresno, CA |

[1] Petitioner filed her return as surviving widow with two dependents.

in New York but through a series of acquaintances they attracted the interest of Mr. Charles R. Leslie, an investor and business promoter from Houston, Tex. In early September of 1967, Mr. Leslie met with the technical founders in Palo Alto, Calif., to discuss investment in the corporation they wished to organize. After several days of discussion, Mr. Leslie agreed to invest in and promote the enterprise.

Mr. Leslie felt at the time that it would be difficult to raise the necessary capital because the project would, in effect, challenge what had, up to that time, been the sole province of IBM and, more importantly, it was feared that the technical founders were vulnerable to a law suit by IBM which could destroy the venture. Moreover, while the technical founders were highly skilled engineers they lacked management experience, which is of prime importance to a venture capital investor. In addition to the foregoing, the technical founders insisted upon a 35-percent interest in the corporation to be organized and, based upon Mr. Leslie's experience, 25 percent was the normal upper limit for the founders. The technical group consisted of men of limited financial means; thus, if they were to acquire a 35-percent interest, much of it would have to be through stock options. As a trade off with potential investors it was agreed that the option price would be far in excess of what the investors would pay for their stock or what was considered to be the stock's market value.

During late September 1967, Mr. Leslie prepared a prospectus upon the advice of his tax attorney and began to solicit funds. At this point it was felt that an initial $1 million for development would be sufficient for approximately 1 1/2 years and after that time it would be necessary to secure additional financing to begin production of the disc pack system.

Mr. Leslie was successful in raising sufficient venture capital, and Information Storage Systems, Inc. (ISS), was incorporated under the laws of the State of California on November 3, 1967.

ISS was incorporated with an authorized capital of $2 million, consisting of 1 class of $1 par value stock. The first 210,000 shares were issued as follows:

| Name | Shares |
|---|---|
| Small Business Enterprises Co., a subsidiary of Bank of America, N.T. & S.A | 17,500 |
| William M. Benners III | 3,850 |
| R. J. Dant | 4,375 |
| Provident Securities Co | 6,825 |
| R. B. Payne | 4,725 |
| Robert Ferris | 10,150 |
| Lloyd Smith | 21,000 |
| Roth Properties | 17,500 |
| W. J. Allen | 18,375 |
| McMicking & Co | 40,825 |
| Charles R. Leslie | 22,875 |
| Martin O. Halfhill | 5,800 |
| Robert B. Crouch | 5,800 |
| Russell K. Brunner | 5,800 |
| John J. Harmon | 5,800 |
| James J. Woo | 5,800 |
| John McNulty | 5,800 |
| Frank J. Sordello | 1,000 |
| C. Richard Hilford | 1,000 |
| Carl E. Westenskow | 1,200 |
| Stanley F. Brown | 1,000 |
| Harold S. Yang | 1,000 |
| Steven J. MacArthur | 1,000 |
| John P. Hammel | 1,000 |
| Total | 210,000 |

Debentures totaling a face amount of $840,000, convertible into 1 share of ISS common stock at the rate of $4.57 face value of debentures were issued to the following:

| Name | Amount |
|---|---|
| McMicking & Co | $215,000 |
| Lloyd Smith | 120,000 |
| W. J. Allen | 105,000 |
| S.B.E.C. | 100,000 |
| Roth Properties | 100,000 |
| W. S. Farish III | 43,000 |
| Foremost-McKesson | 39,000 |
| C. R. Leslie | 29,000 |
| R. B. Payne | 27,000 |
| J. R. Dant | 25,000 |
| W. M. Benners III | 22,000 |
| R. Ferris | 15,000 |
| Total | 840,000 |

In addition, stock purchase warrants for 26,250 shares of $1 par value common stock convertible at $4.57 per share were

issued to Mr. Leslie and McMicking & Co. in the respective amounts of $23,583 and $2,667. Finally, 161,700 shares of $1 par value common were reserved for issuance to employees at $4.57 per share.

Proceeds from sales of the common stock were immediately paid into the corporation but proceeds from sales of the debentures were deferred until directed by the ISS board of directors and were metered into the company as the need for additional funds arose. Convertible debentures were used in the initial financing packages so that the investor group could be assured of salvaging some part of their investment should the enterprise fail and yet be able to participate in appreciation should the venture prove successful. The interest rate on the debentures was not a primary consideration, but rather was designed to comply with the imputed interest rules. Thus, the primary value of the debentures was their position of priority. Convertibility was merely the way to participate in the possible success of ISS.

Some time in February 1968, "paper design" development of the model 711 disc drive began at the ISS facilities in San Jose, Calif. As was generally contemplated, it would take some 2 years to develop the model 711 which would have 50-percent better access time and 50-percent greater information storage capacity than the comparable IBM model. Unlike the IBM disc drive, the 711 would have a self-contained control unit. The 711 was noncompatible with IBM computer equipment and the marketing strategy was to sell to other manufacturers in the original equipment market.

Work proceeded on the paper design of the 711 and at a meeting of the board of directors of ISS on May 23, 1968, a conceptual model of one of the key components of the disc drive, the actuator whose function was the movement of the head devices which record and retrieve information, demonstrated that it was possible with time to manufacture a machine with 50-percent better access time than IBM.

Under the direction of Mr. McNulty, the marketing effort for the model 711 began in April 1968 which consisted of contacting original equipment manufacturers to promote ISS' product which was still being developed. At that time IBM sales to such manufacturers were made at their regular retail price level; thus, the plan developed by Mr. McNulty was to sell the 711 at

somewhat lower prices to companies such as RCA, GE, Honeywell, and Sperry Rand. A major reason for the decision to develop a disc drive which was not compatible with IBM equipment was the belief that IBM might bring a law suit in retaliation because the ISS technical founders were the first group of engineers to leave IBM as a group.

The marketing efforts for the model 711 were unsuccessful. The original equipment manufacturers were not interested in a disc drive which was not compatible with IBM equipment; instead they were primarily interested in designing their own control unit and, therefore, were uninterested in a drive with a self-contained control unit.

ISS decided in late May 1968 to abandon the noncompatible approach and develop a product line which would be plug-to-plug compatible with IBM's products. Shortly thereafter development commenced for the model 701 which was compatible with IBM equipment. The 701 was designed to have improved access time and faster startup time. However, to be IBM compatible, it was not possible to improve capacity. Development of model 701 was hampered from the beginning by a severe resonance problem, i.e., the actuator was not able to properly position the heads over the disc pack track; this problem was not corrected until shortly before the first 701 was shipped to the customer in August 1969.

Also in June 1968 work began on another IBM compatible disc drive model 714, which was intended for the same market, but this system would utilize a different IBM disc pack substantially improving the capacity. The resonance problem encountered on the 701 made it impossible to use the same basic actuator parts on the 714; therefore, the carriage had to be redesigned and work on the 714 was not completed until December 1969. During the same period of time the model 728 control unit was also developed. The IBM 2314 subsystem, with which the 714 was designed to compete, was sold as a unit. Thus, unlike the 701, it was impossible for the 714 to be attached to an IBM control unit and this required ISS to develop its own control unit. In essence, it was the intention of ISS to simulate the IBM subsystem and the 728 attached to nine ISS disc drives was comparable and compatible with the IBM 2314 subsystem. The introduction of the model 728 greatly enhanced the projected sales outlook of

the company because it was the only real competitor in the market for the IBM 2314.

Petitioners Jerald D. Morris, Harold S. Yang, Jack Roy Allgaier, Russell K. Brunner, Stanley F. Brown, Thurman P. Chappell, Robert B. Crouch, John J. Harmon, Martin O. Halfhill, John P. Hammel, Kenji Matsuda, Richard D. Matthews, Timothy W. Martin, Frank J. Sordello, DeWayne Spickler, Carl E. Westenskow, James J. Woo, Wilfred K. Anderson, James E. Barlow, and Steven J. MacArthur (now deceased) were employed by ISS during the period December 1967 through June 1968. For convenience they and their successors in interest hereinafter sometimes will be referred to as optionees.

On November 24, 1967, the board of directors of ISS adopted an employee stock option plan (the plan) intended by them to qualify under section 422 of the Internal Revenue Code of 1954, as amended. The board reserved 161,700 shares of $1 par value common stock to be issued upon exercise of stock options granted under the plan. The plan was approved by the shareholders of ISS and contained the following provisions:

(a) The plan was to be effective from November 24, 1967, and was to terminate after the expiration of 10 years;

(b) The options granted were not exercisable after 5 years from the effective date of grant;

(c) The purchase price for shares was payable in cash at the time of exercise of the option;

(d) The options were not transferable by an optionee during his lifetime and could be exercised only during employment by ISS or within 3 months after termination of employment, and

(e) Individuals eligible for participation in the plan had to be either salaried executives or key employees of ISS.

Specifically the plan provided as follows:

5. Term of Plan

This Plan shall be effective as of November 24, 1967; provided that no options shall be granted hereunder until this Plan has been approved by the shareholders of the Company and until permits relating to options have been obtained from the California Commissioner of Corporations. This Plan shall terminate, except with respect to options then outstanding under the Plan, and no further options shall be issued under the Plan after the expiration of ten years from such date.

6. Option Agreements and Effective Date of Options

(a) With respect to all options granted by the Company pursuant to this Plan, the Company and the employee shall enter into a Qualified Stock Option

Agreement containing such terms and restrictions as the Board or the Option Committee, as the case may be, may deem appropriate and in the best interests of the Company and as may be required to qualify the options as a qualified stock option under the Internal Revenue Code.

(b) Each Qualified Stock Option Agreement presented for signature shall contain the effective date of the option. The "effective date" of the option shall be the date determined by the Board or the Option Committee with respect to each option, but the effective date shall not be prior to the date of employment of the employee or later than the date of the Qualified Stock Option Agreement.

At the November 24, 1967, meeting, the board of directors also appointed an option committee which was delegated the authority to grant stock options under the plan. The members of the option committee so appointed were petitioner John J. Harmon, Mr. C. R. Leslie, and Mr. Roderick Hall. In addition to its members, Mr. Victor Hebert, ISS' corporate counsel, also attended the option committee meetings.

The option committee met on January 11, 1968. Mr. Harmon stated that the stock option agreement form would be presented to qualified ISS employees for signature, and that it would "evidence" the granting of the options to them. In addition, the committee resolved that an application would be filed with the California Department of Investment, Division of Corporations, seeking authorization for ISS to grant stock options and issue shares upon exercise of the options. That application was filed on February 19, 1968, and the permit was issued by the State of California on March 14, 1968. The committee, on January 11, 1968, determined that the exercise price of $4.57 per share was in excess of the fair market value of the ISS shares with respect to which options were granted. The minutes of the January 11, 1968, option committee meeting recite options being granted to the following employees of ISS:

| Employee | Shares | Employee | Shares |
|---|---|---|---|
| James E. Barlow | 1,000 | Elisabeth K. Kiley | 100 |
| Stanley F. Brown | 4,000 | Russell K. Brunner | 19,200 |
| John P. Hammel | 4,000 | Robert B. Crouch | 19,200 |
| Steven J. MacArthur | 6,200 | Martin O. Halfhill | 19,200 |
| Frank J. Sordello | 4,000 | John J. McNulty | 19,200 |
| Carl E. Westenskow | 6,000 | James J. Woo | 19,200 |
| Harold S. Yang | 4,000 | John J. Harmon | 19,200 |
| Charles R. Wilford | 4,000 | | |

It was pointed out at the January 11, 1968, meeting of the option committee that the effective date provided in the option

plan might vary from the date the option was granted, the purpose of the effective date being to commence the "five-year period" in which options could be exercised under the plan.

The option committee met on February 29, 1968, and granted options as follows:

| Employee | Shares |
|---|---|
| Thurman P. Chappell | 1,000 |
| Timothy W. Martin | 4,000 |

The option committee met on April 12, 1968, and granted options to the following employees:

| Employee | Shares | Employee | Shares |
|---|---|---|---|
| John J. Harmon | 283 | Robert B. Crouch | 283 |
| James J. Woo | 284 | Russell K. Brunner | 284 |
| John J. McNulty | 283 | Richard D. Matthews | 4,000 |
| Martin O. Halfhill | 283 | | |

On June 27, 1968, the option committee granted options as follows:

| Employee | Shares | Employee | Shares |
|---|---|---|---|
| Jerald D. Morris | 500 | DeWayne L. Spickler | 500 |
| Kenji Matsuda | 500 | Jack R. Allgaier | 1,000 |

On January 11, 1968, and February 29, 1968, the members of the option committee determined that the option exercise price of $4.57 was in excess of the fair market value of the shares subject to the options granted on these dates. At the meetings on April 12, 1968, and June 27, 1968, the option committee determined that the exercise price of the options granted on those dates was at least equal to the fair market value of the subject shares of stock.

Employees of ISS executed option agreements as follows:

| Employee | Date option agreement executed | Numbers of shares covered by each agreement |
|---|---|---|
| James Woo | 3/21/68 | 19,200 |
| | 4/12/68 | 284 |
| Russell Brunner | 3/21/68 | 19,200 |
| | 4/12/68 | 284 |
| Stanley Brown | 3/20/68 | 4,000 |
| James Barlow | 3/20/68 | 1,000 |
| Charles Wilfred | 3/20/68 | 4,000 |
| Steven MacArthur | 3/20/68 | 6,200 |

| Employee | Date option agreement executed | Numbers of shares covered by each agreement |
|---|---|---|
| Jack Allgaier | 6/7/68 | 1,000 |
| John Harmon | 3/21/68 | 19,200 |
|  | 4/12/68 | 283 |
| Robert Crouch | 3/21/68 | 19,200 |
|  | 4/12/68 | 283 |
| Thurman Chappell | 3/20/68 | 1,000 |
| Frank Sordello | 3/20/68 | 4,000 |
| DeWayne Spickler | 6/14/68 | 500 |
| John Hammel | 3/20/68 | 4,000 |
| Harold Yang | 3/20/68 | 4,000 |
| Carl Westenskow | 3/20/68 | 6,000 |
| Kenji Matsuda | 6/10/68 | 500 |
| Richard Matthews | 4/17/68 | 4,000 |
| Timothy Martin | 3/20/68 | 4,000 |
| Martin Halfhill | 3/21/68 | 19,200 |
|  | 4/12/68 | 283 |
| Jerald Morris | 6/12/68 | 500 |

On March 14, 1968, the Division of Corporations of the State of California issued a permit authorizing ISS to issue shares of its common stock pursuant to the stock option plan.

Throughout the period from December 1967 through June 1968 ISS had no earnings. Therefore, the corporation was unable to pay dividends which, in any event, would have been subject to restrictions contained in the debentures. Moreover, the corporation was in a startup position and, while the technical founders were competent engineers with a good product idea, ISS had very little capital and its future was uncertain. Proceeds from the sale of debentures were supplied to ISS as needed and on the dates that stock options were granted to petitioners, the liquidating value and book value per share of ISS stock were as follows:

| | Year 1968 | | | | |
|---|---|---|---|---|---|
| | 1/11 | 2/29 | 3/22 | 4/12 | 6/27 |
| Original financing 12/67 | $210.00 | $210.00 | $210.00 | $210.00 | $210.00 |
| Amount attributable to debentures | 86.00 | 86.00 | 265.00 | 265.00 | 459.00 |

Investment capitalization:

| Debentures | $840,000 |
|---|---|
| Stock | 210,000 |
| | 1,050,000 |

| | 1/11 | 2/29 | 3/22 | 4/12 | 6/27 |
|---|---|---|---|---|---|
| Metered financing of debentures, values per share all debentures converted | .84 | .50 | .88 | .62 | .94 |

| | | | | |
|---|---|---|---|---|
| Common stock only value per share (no conversion of debentures) .....................51 | .08 | (.14) | (.47) | (.80) |
| Capitalizing machinery and equipment value per share ........................93 | .76 | .62 | .47 | (.13) |

The only stock of ISS that was issued and outstanding from its organization in November 1967 until August 23, 1968, was 210,000 shares of $1 par value common stock with voting rights of one vote per share.

In late June of 1968 the San Francisco investment banking firm of Hambrecht & Quist prepared an investment memorandum covering the proposed second round of financing of ISS. The memorandum, aimed at sophisticated investors, outlined the operation of ISS and described its need for additional capital. Hambrecht & Quist conducted negotiations with qualified potential buyers and ascertained in round figures the amounts in terms of dollars they would be willing to invest in ISS.

At the board of directors meeting on May 23, 1968, it was reported to the board that ISS was making excellent technical progress with the original development funds. However, it was pointed out that a second financing involving some $2.5 million would be needed by October 1968.

At a meeting of the board of directors on June 27, 1968, a plan was proposed which consisted of raising an additional $2.5 million, $2 million in equity financing and one-half million in bank debt. Mr. George Quist, investment banker, was present at the meeting and the board reviewed with him a form of underwriting agreement which was a "firm underwriting" not a "best efforts" underwriting. A resolution was passed authorizing an officer of the corporation to file an application for a negotiating permit and a definitive permit for the issuance of an additional 100,000 shares. On June 25, 1968, corporate counsel for ISS, Mr. Victor Hebert, filed an application with the California corporate commissioner's office requesting that a negotiating permit be issued. In the said application it was represented that ISS desired to place an additional $2 million of securities with institutional and sophisticated investors consisting of common stock to be sold at a price of $20 per share.

By letter dated June 25, 1968, the corporate commissioner's office requested an explanation from Mr. Hebert as to why ISS considered the selling price of $20 per share justified in view of the fact that all shares sold prior to that time had been sold at $1 per share. He responded that the securities were only to be

offered to a select group of sophisticated investors and a few employees with complete knowledge of ISS, and he stated that in all probability the securities would be purchased on the basis of projected earnings.

On July 26, 1968, Hambrecht & Quist agreed to purchase 100,000 shares of $1 par value common stock at $20 per share, or $2 million for resale to sophisticated investors who would hold the stock for investment. The agreement was subject to termination, however, if, in the opinion of Hambrecht & Quist, the market value of securities in general or political, financial, or economic conditions changed in such a way as to render it inadvisable to proceed with the sale.

At the time of the second round of financing, Hambrecht & Quist would have been unwilling to act as investment banker for that financing had members of the founding group desired to sell their stock. Potential investors would view such sales at such an early stage in the development of ISS as a financial bailout by those most intimately associated with the corporation and, therefore, in all probability, no market existed at that time for the founders' shares.

The second round of financing in which 100,000 shares of ISS common stock were sold at $20 per share was completed on August 23, 1968. Shares were issued on that date to the following investors:

| Number of shares | To | Number of shares | To |
|---|---|---|---|
| 1,000 | George B. Moore | 5,000 | F. S. Smithers & Co. |
| 250 | Frank J. Sordello | 100 | Richard D. Matthews |
| 100 | John J. McNulty | 625 | Richard E. Guggenhime |
| 700 | Martin O. Halfhill | 2,500 | Roth Properties |
| 500 | Roy E. Hills, Jr. | 3,175 | Provident Securities Co. |
| 7,500 | McMicking & Co. | 1,250 | Jack R. Dant |
| 100 | Stanley F. Brown | 6,000 | Lloyd Smith |
| 5,000 | FNCB Capital Corp. | 5,000 | Weldon J. Allen |
| 300 | Timothy W. Martin | 500 | Robert Ferris |
| 10,000 | Small Business Enterprises Co. | 1,050 | William Benners III |
| 250 | Harold S. Yang | 500 | C. R. Leslie |
| 250 | Thurman P. Chappell | 4,000 | Fred Stein |
| 5,000 | Hillman Land Co. | 1,500 | Robert B. Payne |
| 2,500 | Dean Witter & Co. | 6,850 | Hambrecht & Quist |
| 1,000 | Sutro & Co. | 15,000 | Mills Partnership |
| 12,500 | Explorer Fund, Inc. | | |

The third round of financing was completed on May 2, 1969. Hambrecht & Quist again acted as investment banker and underwriter pursuant to an agreement with ISS. In this round,

100,000 shares of common stock were sold to the following investors at $30 per share:

| Number of shares | To | Number of shares | To |
|---|---|---|---|
| 16,667 | American Express Investment Management Co. (The Mills Partnership) | 1,000 | J. R. Dant, States Steamship Co. |
| | | 6,666 | F. S. Smithers & Co. |
| | | 1,667 | Lloyd H. Smith |
| 10,000 | Small Business Enterprises | 600 | William M. Benners III |
| 11,400 | Explorer Fund, Inc. (Vest & Co.) | 1,000 | W. J. Allen |
| | | 16,667 | Aetna Life & Casualty Co. |
| 3,333 | FNCB Capital Corp. | 16,667 | The Ford Foundation |
| 5,000 | Hillman Land Co. | 4,000 | Hambrecht & Quist |
| 3,500 | McMicking & Co. | 1,000 | Robert B. Payne |
| 833 | Dean Witter & Co., Inc. | | |

On December 22, 1969, the ISS common stock was split three-to-one. Subsequently, capital was raised in the fourth round of financing underwritten by Hambrecht & Quist through the sale of 140,000 shares of ISS $1 par value common stock at $22 per share, to the following investors with transfers of stock taking place in April 1970:

| Number of shares | To | Number of shares | To |
|---|---|---|---|
| 900 | Stanford Children Convalescent | 3,000 | Robert B. Payne |
| 900 | The Thacher School | 6,800 | Small Business Enterprises Co. |
| 6,800 | Hillman Co. | 2,000 | McMicking & Co. |
| 2,300 | Lila F. Jaeger | 2,300 | Hillsborough Partners |
| 13,600 | The Ford Foundation | 200 | Roy E. Hills, Jr. |
| 2,300 | Hyde & Co. | 1,000 | Richard Guggenhime |
| 4,500 | J. F. Shea & Co. | 2,800 | Susan W. Payne Revocable Trust |
| 4,500 | FNCB Capital Corp. | 6,800 | Venture Associates |
| 4,500 | T. K. Lee | 26,200 | Hambrecht & Quist |
| 11,300 | F. S. Smithers & Co. | 13,600 | Aetna Life & Casualty Co. |
| 1,000 | William Benners III | 22,700 | Corint & Co. |

At the time of the fourth round of financing in early 1970, ISS was enjoying a healthy competitive position in the market. Production and shipment of models 701 and 714 exceeded management expectations, projections for 1970 and 1971 were favorable and funds provided by this round of financing were needed to provide additional working capital required by an increasing sales volume. Management expected additional orders from both old and new customers.

In December 1969, ISS projected sales and earnings as follows:

| | *Year ending Dec. 31—* | | |
|---|---|---|---|
| | *1969* | *1970* | *1971* |
| | *(in thousands of dollars)* | | |
| Sales | $760 | $20,347 | $42,500 |
| Materials in sales | 460 | 8,577 | 15,600 |
| Salaries and benefits | 2,060 | 4,750 | 6,800 |
| Other costs and interest | 1,350 | 2,987 | 2,700 |
| Total costs | 3,870 | 16,314 | 25,100 |
| Net profit (loss) before Federal income taxes | (3,110) | 4,033 | 17,400 |
| Provision for Federal income taxes at 50½% | --- | 113 | 8,787 |
| Net profit (loss) after Federal income taxes | (3,110) | 3,920 | 8,613 |
| Earnings (loss) per share based on 2,575,250 shares outstanding | (1.21) | 1.52 | 3.34 |
| Percent of net profit after Federal income taxes to sales | | 19.3% | 20.3% |

The shareholders' investment in ISS and its subsidiary as of December 31, 1969, and December 31, 1970, was as shown in table II on p. 978.

For the taxable years 1968, 1969, and 1970 ISS had net earnings (losses) as follows:

| Year | Amount | Per share |
|---|---|---|
| 1968 | ($240,924) | ($0.32) |
| 1969 | (2,934,146) | (1.95) |
| 1970 | 3,088,370 | 1.24 |

From the organization of ISS in late 1968, IBM had the capability to change its product pricing structure or leasing terms or introduce a new product into the developing disc drive market and effectively eliminate encroaching competition. In early 1970 IBM changed its marketing tactics by altering its leasing terms which had a substantial impact on the computer industry generally. Telex Corp., which leases computers, had to adjust to the changed competitive atmosphere.

Substantially all of the disc drive sales by ISS up to December 31, 1970, were made to Telex under a marketing agreement granting that corporation the exclusive right to existing ISS products for use on IBM computer systems. On December 31, 1970, the account receivable from Telex was $7,529,860 or about 99 percent of the total accounts receivable of ISS.

The shares of ISS common stock issued pursuant to the employee stock options were subject to a right of refusal in favor of ISS in the event that a shareholder decided to sell his shares and the shares were not registered with the Securities and Exchange Commission for sale to the public. Therefore,

Table II

| | Common stock | Capital surplus | Retained earnings (deficit) |
|---|---|---|---|
| BALANCE 12/31/68 as previously reported | $310,000 | $1,836,000 | ($699,472) |
| To record effect of change in accounting for research and development expenses | | | 8,548 |
| BALANCE 12/31/68 as adjusted | 310,000 | 1,836,000 | (240,924) |
| Proceeds from sale of 100,000 shares of common stock | 100,000 | 2,838,400 | --- |
| Issuance of common stock prior to stock split from: | | | |
| Conversion of 3% convertible subordinated debentures | 183,801 | 656,166 | --- |
| Exercise of employee stock options | 21,732 | 77,583 | --- |
| Exercise of stock purchase warrants | 2,667 | 9,521 | --- |
| Issuance of common stock and transfer from paid-in surplus to common stock in connection with three-for-one split | 1,236,400 | (1,236,400) | --- |
| Issuance of common stock after stock split from: | | | |
| Exercise of employee stock options | 43,407 | 26,960 | --- |
| Exercise of stock purchase warrants | 25,050 | 13,109 | --- |
| NET LOSS | | | (2,934,146) |
| BALANCE 12/31/69 | 1,923,057 | 4,221,339 | (3,175,070) |
| Proceeds from sale of 140,000 shares of common stock | 140,000 | 2,847,600 | --- |
| Issuance of common stock from: | | | |
| Exercise of employee stock options | 329,159 | 181,916 | --- |
| Exercise of stock purchase warrants | 45,699 | 23,916 | --- |
| Proceeds from sale of 8,065 shares of Employees' Stock Purchase Plan | 8,065 | 142,750 | --- |
| NET INCOME | | | 3,088,370 |
| BALANCE 12/31/70 | 2,445,980 | 7,417,521 | (86,700) |

there was, throughout the period from December 1968 to April 1971, no public market for ISS common stock. Throughout the period, the ISS stock certificates contained the following legend imposed by the California Corporation Commission:

It is unlawful to consummate a sale or transfer of this security, or any interest therein, or to receive any consideration therefor, without the prior written consent of the Commissioner of Corporations of the State of California, naming both transferor and transferee, except that transfers may be effected without such consent to the transferor's parents, children, grandchildren, spouse, and custodians or trustees for their account, or to holders of securities of the same class of the issuer of this security, on condition that any certificate evidencing this security issued to such transferee, shall contain this legend condition.

Petitioners sold ISS shares of common stock as follows:

| Petitioner | Date | Number of shares | Price per share |
|------------|------|------------------|-----------------|
| James J. Woo | 4/69 | 3,300 | $29.77 |
| Russell K. Brunner | 5/7/69 | 1,500 | 29.71 |
| John J. Harmon | 5/69 | 800 | 28.87 |
| Martin O. Halfhill | 5/69 | 2,500 | 29.76 |
| John J. Harmon | 6/69 | 3,000 | 30.00 |
| Steven MacArthur | 3/11/70 | 1,500 | 22.00 |
| John P. Hammel | 5/2/70 | 440 | 22.34 |
| James J. Woo | 5/18/70 | 1,000 | 22.00 |
| James J. Woo | 9/30/70 | 1,100 | 15.00 |
| Robert B. Crouch | 11/20/70 | 500 | 14.75 |

On March 14, 1968, the equity capital of ISS did not exceed $1 million.

On January 11, 1971, ITEL Corp. proposed to merge with ISS. On January 22, 1971, the ISS board of directors approved in principle the proposed merger and on April 14, 1971, the shareholders of ISS approved the acquisition of ISS by ITEL Corp. through New Information, Inc., an ITEL subsidiary corporation. Pursuant to the merger, 1.064 shares of ITEL stock were received in exchange for each share of ISS stock surrendered.

The ISS employee stock option plan provided that the price of shares purchased pursuant to the exercise of an option must be paid in full, in cash, at the time of exercise. Out of the original issue of shares, Steven J. MacArthur purchased 1,000 shares of ISS stock. On October 23, 1969, he exercised his option and

purchased 600 shares of ISS stock. Mr. MacArthur died on June 21, 1970; at that time he held an option to purchase an additional 5,600 shares (presplit basis).

On April 15, 1971, Judith A. MacArthur, executrix of the Estate of Steven J. MacArthur, deceased (estate), executed a promissory note in favor of ITEL Corp. for $45,000 payable on or before April 15, 1975, together with interest accrued from April 15, 1971. The note was issued pursuant to the terms of a collateral pledge agreement between the estate and ITEL Corp., also dated April 15, 1971, wherein the estate granted ITEL Corp. a security interest in 5,060 shares. The estate warranted that the collateral was free and clear of liens and there were no restrictions on the transfer of shares except as indicated on the stock certificates. As the indebtedness was repaid, ITEL returned to the estate an appropriate number of shares as outlined in the agreement. Upon default, ITEL could transfer the pledged shares to its name or a nominee and exercise all rights as owner of those shares.

On June 17, 1971, the MacArthur estate exercised its option to purchase 16,800 shares of ITEL (ISS) $1 par value common stock at a price of $1.523 per share; i.e., 5,600 shares of ISS at $4.57 per share on a presplit basis, for a total purchase price of $25,586.40. The exercise agreement provided that payment would be withheld from the proceeds of the $45,000 loan and the balance of the loan would be repaid to the estate.

Petitioners exercised options to purchase ISS common stock on the dates and for the number of shares reflected on the following schedule, which also reflects dates, number of shares sold, and selling prices of shares of ISS common stock sold by certain petitioners on various dates and by ISS in its third and fourth rounds of financing. The schedule also contains, in chronological order, events which bear upon the fair market value of ISS common stock.

| Petitioner's name | Date | Transaction | Number of shares[1] | Price per share | Fair market value per share |
|---|---|---|---|---|---|
| James J. Woo | 4/69 | sale | 3,300 | $29.77 | --- |
| | 4/69 to 5/69 | 3d-round financing | 100,000 | 30.00 | --- |
| Martin O. Halfhill | 5/69 | sale | 2,500 | 29.76 | --- |
| John J. Harmon | 5/69 | sale | 800 | 28.87 | --- |
| Russell K. Brunner | 5/7/69 | sale | 1,500 | 29.71 | --- |
| DeWayne L. Spickler | 6/11/69 | exercise | 166 | --- | $30.00 |
| John J. Harmon | 6/69 | sale | 3,000 | 30.00 | --- |
| John J. Harmon | 10/6/69 | exercise | 6,500 | --- | 30.00 |
| Robert B. Crouch | 10/20/69 | exercise | 6,000 | --- | 30.00 |
| Russell K. Brunner | 10/21/69 | exercise | 6,000 | --- | 30.00 |
| Martin O. Halfhill | 10/23/69 | exercise | 2,400 | --- | 30.00 |
| Steven J. MacArthur | 10/23/69 | exercise | 600 | --- | 30.00 |
| DeWayne L. Spickler | 12/1/69 | exercise | 166 | --- | 22.00 |
| James J. Woo | 12/1/69 | exercise | 6,000 | --- | 22.00 |
| John P. Hammel | 12/8/69 | exercise | 220 | --- | 22.00 |
| Russell K. Brunner | 12/18/69 | exercise | 1,000 | --- | 22.00 |
| | 12/22/69 | 3-for-1 stock split | | | |
| Kenji J. Matsuda | 12/23/69 | exercise | 333 | --- | 22.00 |
| Carl E. Westenskow | 12/24/69 | exercise | 2,000 | --- | 22.00 |
| | 1/28/70 | 4th round financing | 140,000 | 22.00 | --- |
| Timothy W. Martin | 2/9/70 | exercise | 4,000 | --- | 22.00 |
| Harold S. Yang | 2/12/70 | exercise | 2,000 | --- | 22.00 |
| Stanley F. Brown | 2/12/70 | exercise | 4,000 | --- | 22.00 |
| Robert B. Crouch | 2/26/70 | exercise | 13,483 | --- | 22.00 |
| Wilfred K. Anderson | 2/26/70 | exercise | 4,000 | --- | 22.00 |
| John J. Harmon | 2/27/70 | exercise | 12,983 | --- | 22.00 |
| Richard D. Matthews | 2/28/70 | exercise | 2,000 | --- | 22.00 |
| Frank J. Sordello | 3/2/70 | exercise | 3,500 | --- | 22.00 |
| James E. Barlow | 3/6/70 | exercise | 750 | --- | 22.00 |
| Steven J. MacArthur | 3/11/70 | sale | 1,500 | 22.00 | --- |
| Jerald D. Morris | 4/28/70 | exercise | 333 | --- | 22.00 |
| Martin O. Halfhill | 4/28/70 | exercise | 5,033 | --- | 22.00 |
| John P. Hammel | 5/2/70 | sale | 440 | 22.34 | --- |
| James J. Woo | 5/18/70 | sale | 1,000 | 22.00 | --- |
| James J. Woo | 6/1/70 | exercise | 10,984 | --- | 22.00 |
| John P. Hammel | 6/3/70 | exercise | 2,000 | --- | 22.00 |
| Dewayne L. Spickler | 6/4/70 | exercise | 84 | --- | 22.00 |
| Russell K. Brunner | 6/8/70 | exercise | 10,000 | --- | 22.00 |
| Thurman P. Chappell | 6/19/70 | exercise | 1,200 | --- | 22.00 |
| Kenji J. Matsuda | 8/4/70 | exercise | 167 | --- | 15.00 |
| James J. Woo | 9/30/70 | sale | 1,100 | 15.00 | --- |
| Robert B. Crouch | 11/20/70 | sale | 500 | 14.75 | --- |
| James J. Woo | 11/24/70 | exercise | 2,500 | --- | 14.75 |
| Martin O. Halfhill | 11/24/70 | exercise | 12,500 | --- | 14.75 |
| Russell K. Brunner | 11/24/70 | exercise | 2,484 | --- | 14.75 |
| Carl E. Westenskow | 12/22/70 | exercise | 667 | --- | 14.75 |
| Thurman P. Chappell | 12/28/70 | exercise | 300 | --- | 14.75 |

| Petitioner's name | Date | Transaction | Number of shares[1] | Price per share | Fair market value per share |
|---|---|---|---|---|---|
| Jack R. Allgaier | 12/29/70 | exercise | 435 | --- | 14.75 |
| Jerald D. Morris | 12/31/70 | exercise | 167 | --- | 14.75 |
| | 1/11/71 | proposed ITEL merger announced | | | |
| Harold S. Yang | 1/11/71 | exercise | 2,000 | --- | 13.00 |
| John P. Hammel | 1/11/71 | exercise | 1,780 | --- | 13.00 |
| Richard D. Matthews | 1/11/71 | exercise | 2,000 | --- | 13.00 |
| Frank J. Sordello | 1/11/71 | exercise | 500 | --- | 13.00 |
| Carl E. Westenskow | 1/11/71 | exercise | 3,333 | --- | 13.00 |
| DeWayne L. Spickler | 2/28/71 | exercise | 84 | --- | 13.00 |
| | 4/15/71 | ISS, ITEL merger final (ratio: 1.064 shares of ITEL for each share ISS) | | | |
| James E. Barlow | 6/7/71 | exercise | 250 | --- | 12.86 |
| Estate of Steven J. MacArthur | 6/17/71 | exercise | 5,600 | --- | 12.86 |
| Thurman P. Chappell | 10/12/72 | exercise | 1,500 | --- | 9.00 |

[1]Number of shares on exercise unadjusted for 12/22/69 three-for-one stock split.

On March 14, 1968, petitioners Brunner, Crouch, Harmon, Halfhill, and Woo each owned 5,800 shares of common stock of ISS and on that date each held unexercised options to acquire 19,200 shares of such stock. On the same date there were issued and outstanding 210,000 shares of common stock of ISS.

On the dates indicated, petitioners exercised options to purchase the following number of shares of common stock of ISS:

| Date | Brunner | Crouch | Harmon | Halfhill | Woo |
|---|---|---|---|---|---|
| 10/6/69 | 0 | 0 | 6,500 | 0 | 0 |
| 10/20/69 | 0 | 6,000 | 0 | 0 | 0 |
| 10/21/69 | 6,000 | 0 | 0 | 0 | 0 |
| 10/23/69 | 0 | 0 | 0 | 2,400 | 0 |
| 12/1/69 | 0 | 0 | 0 | 0 | 6,000 |
| 12/18/69 | 1,000 | 0 | 0 | 0 | 0 |
| 2/26/70 | 0 | 13,483 | 0 | 0 | 0 |
| 2/27/70 | 0 | 0 | 12,983 | 0 | 0 |
| 4/28/70 | 0 | 0 | 0 | 5,033 | 0 |
| 6/1/70 | 0 | 0 | 0 | 0 | 10,984 |
| 6/8/70 | 10,000 | 0 | 0 | 0 | 0 |
| 11/24/70 | 2,484 | 0 | 0 | 12,050 | 2,500 |
| Totals | 19,484 | 19,483 | 19,483 | 19,483 | 19,484 |

In his statutory notices of deficiency to all petitioners, the Commissioner determined the following:

(a) You are determined to have realized and are required to recognize additional income in the taxable year [1969, 1970, 1971, and 1972, as the case may be] in the form of additional compensation by reason of your exercise of an option to acquire stock of Information Storage Systems, Inc. It is

determined that the options granted to you by Information Storage Systems, Inc., are not qualified stock options since it is held that the fair market value of the stock exceeded the option prices at the date of the option grant, and it is also determined that a good faith attempt to value the stock at the date of the option grant was not made. Accordingly, you are determined to have realized income at the time you exercised the options (and you had an unconditional right to the stock) because it is held that the options did not have a readily ascertainable fair market value at the time they were granted; further, income was realized at the time the options were exercised (and you had an unconditional right to the stock) as the stock was not subject to any restrictions which had a significant effect on its value. The amount of income determined to have been realized is computed below. The amount of shares covered by the 1967 option plan as originally set forth is multiplied by three to reflect the three for one split of the stock on December 22, 1969; the basis per share is accordingly one/third of the $4.57 stated price per the option agreement, or $1.523. The fair market value at the date of exercise of the option reflects the price per share for sales of Information Storage Systems, Inc., or by shareholders, on dates on or close to the date of exercise of the options.

He further determined the following:

As an alternative to the adjustment shown in paragraph (a) above, it is determined that the amount reported on your [1970, 1971, or 1972] return as a tax preference item for stock options did not adequately reflect the difference between fair market value of Information Storage Systems, Inc., stock at the date of exercise and the option price. The tax preference amount should be calculated in accordance with the [1970, 1971, or 1972] fair market value shown at paragraph (a) above. Section 57(a)(6) of the Internal Revenue Code of 1954.

In addition, he made the following determination as to petitioners Brunner (docket No. 10238–75), Crouch (docket No. 10241–75), Halfhill (docket No. 10243–75), Harmon (docket No. 10242–75), and Woo (docket No. 10253–75):

As an alternative to the adjustments shown in paragraph (a) above, it is determined that you should recognize income * * * for 1970 as shown below, because the stock option granted to you by Information Storage Systems, Inc., is not a qualified stock option to the extent that immediately after the option was granted, you owned stock possessing more than 10% of the total voting power or value of all classes of Information Storage Systems, Inc., stock. Section 422(b)(7) of the Internal Revenue Code of 1954.

The Commissioner, in statutory notices of deficiency to successors in interest to Steven J. MacArthur (docket Nos. 10257–75, 10258–75, 10261–75, and 10263–75) determined in addition to his determinations set forth above, the following:

The grant date of stock acquired through the 1967 and 1968 stock option plans has been determined to be April 15, 1971, the date of the promissory note signed on behalf of the Estate of Steven J. MacArthur in payment for the

stock. Since the original option plans required payment in cash, payment by promissory note constitutes a change in the option plans and a later grant date of April 15, 1971. Section 425(h) of the 1954 Internal Revenue Code.

Total shares granted by 1967 option plan:
6,200 shares at $4.57 per share on April 15, 1971

Total shares granted by 1968 option plan:
300 shares at $6.67 per share on April 15, 1971

Shares acquired by exercise of options in 1971:
5,600 shares × 3 = 16,800 on June 17, 1971
300 shares on June 17, 1971

Fair market value per share at date of exercise:
$12.86 per share on June 17, 1971

Computation of ordinary income realized in 1971:
Shares acquired June 17, 1971
16,800 shares × $12.86

| | | |
|---|---:|---:|
| Fair market value = | $216,048 | |
| Less basis: 16,800 shares × $1.523 = | 25,586 | $190,462 |

Shares acquired June 17, 1971
300 shares × $12.86

| | | |
|---|---:|---:|
| Fair market value = | 3,858 | |
| Less basis: 300 shares × $6.67 = | 2,001 | 1,857 |

Increase in income — ordinary income realized ................... 192,319
½ to Estate of Steven J. MacArthur, deceased ................... 96,160

As an alternative to the adjustment shown in paragraph (a) above, if it is determined there was not a change in the stock option plans resulting in a later grant date, then additional ordinary income of $96,160.00 should be recognized for 1971 on exercise of the options as shown in the computation for item (a) above. Under these circumstances the grant dates will be considered the dates on which Steven J. MacArthur and Information Storage Systems, Inc. signed stock option agreements. The reason for this adjustment is the same as given at item (a) above.

The Commissioner determined the liabilities for tax in docket Nos. 10260–75, 10261–75, 10262–75, and 10263–75 as transferees of the assets of the Estate of Steven J. MacArthur. Petitioners in those cases concede transferee liability to the extent that deficiencies in tax are determined against the transferor not in excess of the assets transferred.

### ULTIMATE FINDINGS OF FACT

(1) Throughout the period January 11, 1968, through June 27,

1968, the fair market value of the ISS common stock subject to the options did not exceed the option price of $4.57.

(2) The fair market value of ISS common stock per share was as follows on the dates indicated:

| Date | Fair market value per share | Date | Fair market value per share | Date | Fair market value per share |
|---|---|---|---|---|---|
| 6/11/69 | $30.00 | 2/26/70 | $22.00 | 11/24/70 | $14.75 |
| 10/6/69 | 30.00 | 2/27/70 | 22.00 | 12/22/70 | 14.75 |
| 10/20/69 | 30.00 | 2/28/70 | 22.00 | 12/28/70 | 14.75 |
| 10/21/69 | 30.00 | 3/2/70 | 22.00 | 12/29/70 | 14.75 |
| 10/23/69 | 30.00 | 3/6/70 | 22.00 | 12/31/70 | 14.75 |
| 12/1/69 | 22.00 | 4/28/70 | 22.00 | 1/11/71 | 13.00 |
| 12/8/69 | 22.00 | 6/1/70 | 22.00 | 2/28/71 | 13.00 |
| 12/18/69 | 22.00 | 6/3/70 | 22.00 | 4/15/71 | 12.93 |
| 12/23/69 | 22.00 | 6/4/70 | 22.00 | 6/7/71 | 12.86 |
| 12/24/69 | 22.00 | 6/8/70 | 22.00 | 6/17/71 | 12.86 |
| 2/9/70 | 22.00 | 6/19/70 | 22.00 | 10/12/72 | 9.00 |
| 2/12/70 | 22.00 | 8/4/70 | 15.00 | | |

## OPINION

### *Issue 1. Fair Market Value of ISS Stock on Dates Options Were Granted*

The first issue for our decision is whether the fair market value of the ISS common stock subject to the options held by petitioners was in excess of $4.57 per share on the dates those options were granted. The Commissioner determined that the fair market value of the ISS stock exceeded $4.57 per share and, therefore, that the options granted pursuant to the 1967 ISS stock option plan were not qualified stock options within the meaning of section 422(b)(4), Internal Revenue Code of 1954.[2] Except with respect to options for 5,600 shares granted to petitioners Steven J. MacArthur and Judith A. Pledger, the parties agree that all options were granted between January 11, 1968, and June 27, 1968. Petitioners contend that throughout that period the fair market value of the ISS common stock did not exceed $4.57 per share. We agree with petitioners.

The corporation enterprise that was to become ISS had its genesis in the autumn of 1967 when Mr. Charles Leslie traveled to California to discuss with a group of IBM employees (the technical founders of ISS) investment in a corporation which would manufacture and develop a data storage and retrieval system employing a disc drive to be used in conjunction with

---

[2] All section references are to the Internal Revenue Code of 1954, as amended.

other components in computer systems. Mr. Leslie agreed to promote the enterprise and, after some difficulty, he was able to attract the interest of sufficient venture capital to initially capitalize ISS, and it was incorporated in November 1967. However, at that time the general economic climate and, thus, the prospects for success, seemed tenuous at best. There was substantial fear that IBM might bring suit against ISS because its principal technical employees had been IBM employees and, thus, perhaps were in possession of trade secrets or other information which IBM would seek to protect through litigation, which would probably destroy ISS.

With this threat, ISS' business plan called for development of a product which would not be compatible with IBM and would be sold to other manufacturers in the original equipment market. This, it was hoped, would assuage IBM and avoid litigation and, at the same time, tap a new and profitable market. Therefore, development on the "paper design" phase of the non-IBM compatible model 711 disc drive began in February 1968 and it was thought that it would take about 2 years to complete development. Work proceeded and, in May 1968, a "conceptual" model of one key component was successfully tested. Unfortunately, however, the concurrent marketing efforts for this machine were unsuccessful because the prospective customers were not interested in a disc drive that was not compatible with IBM equipment; moreover, there was little interest in a unit with a self-contained control unit, which was a principal feature of the model 711. Thus, in late May 1968, the noncompatible approach was abandoned and development of a new product line was commenced which would be compatible with IBM equipment. It would not be possible to increase the storage capacity in this model. In addition to the elimination of this advantage, development of the new model was continuously hampered by severe resonance problems which were not overcome until August 1969.

Therefore, from the foregoing, it is clear that throughout the period January through June of 1968 not only did ISS miscalculate its potential market, i.e., the demand for its product, but it also was faced with the prospects of litigation which could prove fatal. Moreover, it was not until May of that year that a product line was developed which could be marketed.

The initial issue of capital stock of ISS was 210,000 shares of

common stock at $1 per share. However, the bulk of these shares (168,000) was subscribed by venture capitalists who were investing not in terms of number of shares, but rather dollar amounts which they hoped to recoup with a profit should the venture prove successful. In addition to the shares sold, convertible debentures were also sold for $840,000. However, proceeds from the sale of debentures were metered into the corporation as needed and, therefore, were available to ISS only as the need for additional funds arose. Thus, throughout the period ending in late June 1968 funds available for distribution to common shareholders as dividends or in liquidation ranged from a high of 0.51 per share to a low of minus 0.80 per share. Capitalizing machinery and equipment produced a book value of only 0.93 per share in January to minus 0.13 per share in late June. ISS had no earnings and therefore, could not pay dividends throughout the period; indeed, no earnings were realized until 1970, and for the taxable year 1968 ISS suffered a loss of 0.32 per share.

From the record as a whole, we are convinced that the fair market value of the ISS stock did not exceed the option price of $4.57 throughout the period ending June 27, 1968, and accordingly we so hold.

Respondent did not call as his witness the revenue agent who determined the fair market value of the ISS common stock. Instead, he relied upon the opinion of an expert witness who backed into values of the stock by assuming a rating for the convertible debentures and attributing a value to the conversion privilege. The valuation was extremely theoretical and was based upon numerous assumptions. Respondent's proof was not sufficient to overcome the overwhelming proof of petitioners that the ISS common stock was not worth more than $4.57 per share from January 11, 1968, to June 27, 1968.

Because we have held that the fair market value of the stock was less than the option price when the stock options were granted, it is unnecessary for us to find as a fact whether there was a good faith attempt to set the option price at not less than the fair market value of the stock as provided in section 1.422–2(e)(2)(ii), Income Tax Regs.

## Issue 2. *Fair Market Value of ISS Stock on Dates Options Were Exercised*

Beginning in June 1969 and continuing until October 1972, petitioners exercised options previously granted to them by ISS. Pursuant to section 57(a)(6),[3] I.R.C. 1954, the excess of the fair market value of stock subject to a qualified stock option over the option price is an item of tax preference and subject to a 10-percent tax for the taxable years under consideration. Moreover, to the extent that petitioners Brunner, Crouch, Halfhill, Harmon, and Woo received options that are not qualified by reason of section 422(b)(7), they are liable for a tax at ordinary income rates on the difference between the stock's fair market value at the date of exercise and the option price. The next issue we must decide then is the fair market value of the ISS stock on the various dates petitioners exercised the options which were granted under the ISS plan. This valuation issue is purely factual and the burden of proof rests squarely on petitioners. *Welch v. Helvering,* 290 U.S. 111 (1933); Rule 142, Tax Court Rules of Practice and Procedure.

There is perhaps no rule of tax law more often stated than that fair market value is the price at which property would change hands between a willing buyer and seller, neither being under any compulsion to buy or sell. It is equally well settled that the best evidence of that value is, in general, actual sales made in reasonable amounts and at arm's length within a reasonable time before or after the date for which a value is sought. See, e.g., *Fitts' Estate v. Commissioner,* 237 F.2d 729 (8th Cir. 1956); *Estate of McKitterick v. Commissioner,* 42 B.T.A. 130 (1940).

Respondent's expert witness, a valuation specialist with the Internal Revenue Service, concluded that proper valuation of ISS stock throughout the period May 1969 through October 1972 could best be ascertained by comparison with the actual sales of some 15,000 shares of ISS which took place within that period and the prices at which the shares were sold in the third and

---

[3]SEC. 57(a)(6) STOCK OPTIONS.—With respect to the transfer of a share of stock pursuant to the exercise of a qualified stock option (as defined in section 422(b)) or a restricted stock option (as defined in section 424(b)), the amount by which the fair market value of the share at the time of exercise exceeds the option price.

fourth rounds of financing which also took place during that period. We agree, with some slight modifications.

Petitioners argue that the sales which took place were broker transactions arranged by Hambrecht & Quist and, therefore, were not indicative of fair market value. However, petitioners failed to produce any evidence to support this contention. Indeed, during the trial on more than one occasion the Court expressed its concern over these sales, yet with the door thus opened petitioners did not produce evidence to explain the reasons for the sales or the circumstances under which they took place; no facts were presented to indicate that the sales were other than at arm's length. Petitioners' expert witness testified that he gave the sales little weight because in his opinion the numbers of shares sold were not indicative of a market for the stock. But we are impressed by the fact that the sales in terms of numbers of shares sold are roughly the same as those to be valued on the exercise dates; for example, 1,500 shares were sold on March 11, 1970, and options for 750 shares were exercised on March 6, 1970. In the absence of evidence of unusual circumstances which would deprive these sales of their evidentiary value, we are unable to concur in the view that these sales do not accurately reflect the stock's fair market value. Indeed, since ISS was not organized until late 1967 and the initial rounds of financing were not completed until mid–1968, we find that these sales were not isolated, or in terms of their number, insignificant. Petitioners would, for example, have us ascribe a value of $5 per share on December 22, 1969, when the stock was split with a presplit price of $66 and sold in February 1970 for $22. At the time of the fourth round of financing, and throughout 1970, management expectations and projections were favorable, shipments of models 701 and 714 exceeded projections, the corporation was enjoying a healthy position in the market, and funds were needed not so much to insure the company's survival, but to provide additional working capital demanded by an increasing sales volume. These factors lend substantial support to respondent's position that the fair market value of ISS stock was the sale price near to the particular exercise date.

Petitioners would have us discount their shares to take cognizance of a lack of marketability resulting from investment letter restrictions. Under the facts of this case, we are unable to conclude that such a discount is proper. All of the outstanding

shares of ISS were subject to restriction imposed by the SEC and the California Corporation Commission, thus there were no freely transferable shares outstanding. Petitioners' stock would not be less marketable than other ISS shares in general or those sold during the period under consideration in particular, and consequently there would not be a discount applied premised upon these restrictions. See *Frank v. Commissioner*, 54 T.C. 75, 96 (1970).

Petitioners point to *Central Trust Co. v. United States*, 305 F.2d 393 (Ct. Cl. 1962), where the court did not accept as indicative of fair market value the prices at which isolated sales of a closely held corporation took place. Petitioners' reliance on that case is misplaced. In *Central Trust* crucial to the court's conclusion was a finding that all the sales in question were made at a prearranged price to employees and family friends when the company was experiencing severe financial difficulties. Moreover, the sales in that case were remote in proximity to the date of valuation. No similar facts have been presented herein. Petitioners offered no evidence to show to whom petitioners sold their stock. We similarly refused in *Estate of Vandenhoeck v. Commissioner*, 4 T.C. 125 (1944), to accept as conclusive the sale between related parties of small lots of stock, most of which were broker transactions, when the lots sold were small in proportion to the outstanding stock, and the block to be valued was substantial. But where, as in the instant case, the sales are comparable to the shares to be valued both in terms of time and the number of shares sold, we find it unnecessary to resort to other evidence of value. From the record we conclude that the sales transactions between actual buyers and sellers are the best evidence of value. See *Fitts' Estate v. Commissioner, supra; Coastal Chemical Corp. v. United States*, 546 F.2d 110 (5th Cir. 1977); *Estate of McKitterick v. Commissioner, supra*. Accordingly, we have detailed in our findings the fair market value of the ISS stock on the exercise dates, and we hold that these amounts represent the fair market value on those dates.

## Issue 3. Dates Options Were Granted

Because we have found that the fair market value of the ISS stock did not exceed the option price of $4.57 from January 11, 1968, to June 27, 1968, it is not necessary to decide the precise dates upon which ISS granted the options for purposes of section

422(b)(4). However, respondent contends that petitioners Brunner, Crouch, Harmon, Halfhill, and Woo did not receive qualified stock options for 19,200 shares each for the additional reason that each owned stock possessing voting power and/or value in excess of the limitations of section 422(b)(7). Under that section, an optionee's percentage limitation must be ascertained "immediately after such option is granted" and, therefore, with respect to these petitioners it is necessary to fix the dates of grant in order to make the necessary calculations. Respondent contends that the options were granted to these petitioners on March 21, 1968, the date upon which each signed stock option agreements. Respondent maintains that the intention of ISS was that the options were not granted prior to (1) the issuance by the California Corporation Commission of a permit to grant the options (Mar. 14, 1968); (2) requisite action had been taken by the option committee (Jan. 11, 1968); (3) and the employees to whom options were granted actually executed option agreements (Mar. 21, 1968). Petitioners are of the view, however, that all corporate action necessary to grant the options was completed when the option committee met on January 11, 1968, and thus the options were granted on January 11, 1968.

Both parties cite as authority section 1.421-7(c),[4] Income Tax Regs., albeit arguing for different results. That section provides that the date of granting a stock option will be the date upon

---

[4]Sec. 1.421-7(c)(1) and (2), Income Tax Regs., provides as follows: "(1) For purposes of sections 421 through 425, the words 'the date of the granting of the option' and 'the time such option is granted,' and similar phrases refer to the date or time when the corporation completes the corporate action constituting an offer of stock for sale to an individual under the terms and conditions of a statutory option. Ordinarily, if the corporate action contemplates an immediate offer of stock for sale to an individual or to a class including such individual, or contemplates a particular date on which such offer is to be made, the time or date of the granting of the option is the time or date of such corporate action if the offer is to be made immediately, or the date contemplated as the date of the offer, as the case may be. However, an unreasonable delay in the giving of notice of such offer to the individual or to the class will be taken into account as indicating that the corporation contemplated that the offer was to be made at the subsequent date on which such notice is given.

"(2) If the corporation imposes conditions on the granting of an option (as distinguished from conditions governing the exercise of the option), such conditions shall be given effect in accordance with the intent of the corporation. However, under section 425(i), if the grant of an option is subject to approval by stockholders, the date of grant of the option shall be determined as if the option had not been subject to such approval. A condition which does not require corporate action, such as the approval of, or registration with, some regulatory governmental agency, for example, a stock exchange or the Securities and Exchange Commission, is ordinarily considered a condition upon the exercise of the option unless the corporate action clearly indicates that the option is not to be granted until such condition is satisfied. If an option is granted to an individual upon the condition that such individual will become an employee of the corporation granting the option or of a related corporation, such option is not granted prior to the date the individual becomes such an employee."

which the corporation completes corporate action constituting an offer of stock under the terms of a statutory stock option plan, but if conditions on the grant are imposed, they are to be given effect. The same regulation further provides that conditions which do not require corporate action (such as registration with a regulatory or governmental agency) are, in general, considered to be merely conditions upon the exercise of an option, as contrasted with the grant of an option, unless corporate action "clearly indicates" that the option is not to be granted until the condition is satisfied.

While the terms of the ISS stock option plan are somewhat ambiguous and, perhaps, even contradictory, we conclude that grant dates would not be fixed until authorization to grant options had been secured from the California Corporation Commission. Section 5 of the 1967 ISS plan provides in pertinent part the following:

> This plan shall be effective as of November 24, 1967; provided that no options shall be granted hereunder until this plan has been approved * * * and until permits relating to options have been obtained from the California Commissioner of Corporations. * * *

We fail to perceive how corporate intent with respect to State authorization could be more clearly manifest. Respondent contends that the employees' signatures on stock option agreements were also prerequisite. We are unable to agree. Section 6 of the plan provides that ISS and the particular employee must enter into a stock option agreement. There is no language in the plan from which we can conclude that the execution of such an agreement was a necessary prerequisite to the grant of an option. Moreover, that same section also provides that the effective date of the option should be "determined by the Board or Option Committee." Mr. Leslie, a member of that committee, and Mr. Hebert, its secretary, both testified that it was the intention of the option committee that the option be granted at the time of its meeting. While we hold that the language of section 5 of the plan establishes the grant dates after securing State permits, there is no analogous "clear" language in section 6; thus, we conclude that there was no clear manifestation of corporate intent as required by section 1.421-7(c)(2), Income Tax Regs., and we, therefore, hold that employee signatures were merely a condition upon exercise. Therefore, with respect to the options ostensibly granted at the January 11,

1968, meeting of the option committee we find that the grant date for these five petitioners was March 14, 1968, the date the Division of Corporations of the State of California authorized issuing the stock pursuant to the stock option plan.

## Issue 4. The Requirement of Section 422(b)(7)

We have held that the options granted to petitioners Brunner, Crouch, Harmon, Halfhill, and Woo were granted on March 14, 1968. It is, therefore, that date which controls in ascertaining whether any of them possessed more than the prohibited percentage of the total combined voting power or value of all classes of stock of ISS provided in section 422(b)(7). The parties agree that the equity capital of ISS did not exceed $1 million on March 14, 1968, therefore the percentage to be applied is 10 percent.

The stock options deemed granted on March 14, 1968, to the five petitioners enumerated above are not qualified to the extent that such petitioners owned more than 10 percent of the outstanding stock of ISS on March 14, 1968.

First, petitioners contend that stock *issuable* to debenture holders who could convert their debentures to stock should be considered as outstanding shares for purposes of section 422(b)(7). Petitioners argue that the shares *issuable* for the debentures should be considered as outstanding because the cash required for the purchase of such debentures was a part of the corporate assets during the period in which the options were granted, as contrasted with the options granted which merely gave the option holder the right to contribute cash at some future date should the business become successful. There is no contention that the debentures were converted during the period in question, thus, petitioners, in effect, contend that the ostensible debt was, in fact, equity, and should be so considered for purposes of applying section 422(b)(7).

While convertible debentures have a certain attribute of equity, they are treated as indebtedness unless in fact they represent an equity interest. Cf. *Helvering v. Southwest Consolidated Corp.*, 315 U.S. 194 (1942); *Commissioner v. Neustadt's Trust*, 131 F.2d 528 (2d Cir. 1942).

From the record here two qualities of the debentures are notable. First, proceeds from the sales of the debentures were metered into the corporation during the period that options were

granted as dictated by Mr. Leslie who represented the investor group on the board of directors, and, therefore, substantial proceeds from sales of debentures were not, as petitioners contend, at risk throughout the period that options were granted. Second, convertible debentures were primarily utilized in the initial financing to ensure that some part of the capital provided by the investor group could be salvaged should the corporation prove unsuccessful. There is no evidence from which we can conclude either that the payment of interest on the debentures was contingent on earnings or at management's discretion, or that the parties intended to treat the debentures as an equity interest. Therefore, the evidence is insufficient to show that the convertible debentures represented equity. Accordingly, we hold that the shares *issuable* upon conversion of debentures are not to be treated as outstanding shares of stock for purposes of applying section 422(b)(7). See our discussion *infra* as to the effect of the ownership of convertible debentures only held by shareholders whose control is placed in issue.

In order to more easily understand the application of section 422(b)(7) to the facts involved here, the following schedule depicts the various dates that options were granted to and exercised by petitioners Brunner, Crouch, Harmon, Halfhill, and Woo and their stock ownership:

|  | Brunner | Crouch | Harmon | Halfhill | Woo |
|---|---|---|---|---|---|
| Initial issue of shares purchased | 5,800 | 5,800 | 5,800 | 5,800 | 5,800 |
| Options granted on 3/14/68 | 19,200 | 19,200 | 19,200 | 19,200 | 19,200 |
| Options granted on 4/12/68 | 284 | 283 | 283 | 283 | 284 |
| Total granted | 19,484 | 19,483 | 19,483 | 19,483 | 19,484 |

| *Options exercised:* | Brunner | Crouch | Harmon | Halfhill | Woo |
|---|---|---|---|---|---|
| 10/6/69 | 0 | 0 | 6,500 | 0 | 0 |
| 10/20/69 | 0 | 6,000 | 0 | 0 | 0 |
| 10/21/69 | 6,000 | 0 | 0 | 0 | 0 |
| 10/23/69 | 0 | 0 | 0 | 2,400 | 0 |
| 12/1/69 | 0 | 0 | 0 | 0 | 6,000 |
| 12/18/69 | 1,000 | 0 | 0 | 0 | 0 |
| 2/26/70 | 0 | 13,483 | 0 | 0 | 0 |
| 2/27/70 | 0 | 0 | 12,983 | 0 | 0 |
| 4/28/70 | 0 | 0 | 0 | 5,033 | 0 |
| 6/1/70 | 0 | 0 | 0 | 0 | 10,984 |
| 6/8/70 | 10,000 | 0 | 0 | 0 | 0 |
| 11/24/70 | 2,484 | 0 | 0 | 12,050 | 2,500 |
| Total exercised | 19,484 | 19,483 | 19,483 | 19,483 | 19,484 |

The determination as to whether an option is a qualified stock option is made at the time it is granted. Sec. 1.422–2(a)(1)(ii),

Income Tax Regs. Therefore, in this case, it is necessary to make that determination on March 14, 1968, and April 12, 1968.

Section 1.422–2(h), Income Tax Regs., sets forth the techniques employed to ascertain whether an optionee owns more than 10 percent of the outstanding stock proscribed by section 422(b)(7) of the Code which would disqualify the option to the extent that it results in ownership in excess of 10 percent. Sec. 422(c)(3)(C). Section 1.422–2 (h)(1)(i), Income Tax Regs., conforming to section 422 (c)(3)(C), provides that stock which an individual may purchase under outstanding options shall be treated as stock owned by such individual. Section 1.422–2(h)(1)(ii), Income Tax Regs., provides that the percentage of ownership is ascertained by comparing the voting power of the shares owned by the individual or treated as owned by the individual to the aggregate voting power of all of the shares actually issued and outstanding. The section goes on to provide that—

The aggregate voting power or value of all shares actually issued and outstanding immediately after the grant of the option does not include the voting power or value of treasury shares or shares authorized for issue under outstanding options held by the individual or any other person.

In other words, in order to ascertain whether an optionee effectively owns more than 10 percent of the corporate stock, the shares he may acquire by exercising options are included in the numerator of the fraction but are not included in the denominator.

On March 14, 1968 (the date we have determined that the first stock options were granted), petitioners Brunner, Crouch, Harmon, Halfhill, and Woo each owned 5,800 shares of ISS common stock and each held unexercised options to purchase an additional 19,200 shares. On that date, there were issued and outstanding 210,000 shares of ISS common stock. Applying section 1.422–2(h)(1)(ii), Income Tax Regs., to the facts as to each of the five petitioners on March 14, 1968, the following would result:

Shares owned .......................................5,800
+ Options granted 3/14/68 ..................... 19,200
= Shares attributed ........................... 25,000

$$\frac{\text{Shares attributed}}{\text{Total shares}} = \frac{25,000}{210,000} = 11.91\%$$

Under the regulations, therefore, each of the five petitioners would own more than 10 percent of the outstanding shares and the excess of 10 percent of their options for 19,200 shares would not be qualified stock options. Sec. 422(b)(7).

Petitioners contend that section 1.422–2(h)(1)(ii), Income Tax Regs., is invalid, however, wherein it requires inclusion of stock covered by options held by the employee in the numerator of the fraction but does not permit inclusion in the denominator. If petitioners are correct, the following would result with respect to March 14, 1968:

Shares owned ......................................... 5,800
+ Options granted 3/14/68 .................... 19,200
= Shares attributed ............................. 25,000

$$\frac{\text{Shares attributed}}{\text{Total shares}} = \frac{25,000}{229,200} = 10.91\%$$

In applying the formula under the regulations to the options granted on April 12, 1968, the following results:

Shares owned ......................................... 5,800
+ Options granted 3/14/68 .................... 19,200
+ Options granted 4/12/68 ....................... [1]283
= Shares attributed ............................. 25,283

$$\frac{\text{Shares attributed}}{\text{Total shares}} = \frac{25,283}{210,000} = 12.04\%$$

[1] Some were granted 284.

If the formula urged by petitioners is applied to the facts when options were granted on April 12, 1968, the following results:

Shares owned ......................................... 5,800
+ Options granted 3/14/68 .................... 19,200
+ Options granted 4/12/68 ....................... [1]283
= Shares attributed ............................. 25,283

$$\frac{\text{Shares attributed}}{\text{Total shares}} = \frac{25,283}{229,483} = 11.02\%$$

[1] Some were granted 284.

It is apparent, therefore, that under the formulas urged by both petitioners and respondent, some of the options granted to

petitioners Brunner, Crouch, Harmon, Halfhill, and Woo were not qualified stock options.

Petitioners do not contend that the denominator of the fraction applied to each petitioner should include stock covered by options granted to others but only the options granted to the petitioner involved. Nor would we so hold. The purpose of adding to the shares owned by an optionee the shares covered by options he holds to ascertain his degree of control of the corporation is to charge him with shares he has the capability to acquire to gain control. The optionee has no control (except by attribution rules) over options granted to others.

Petitioners contend that the regulations are invalid by requiring inclusion of stock covered by options in the numerator of the fraction but denying inclusion in the denominator. Inclusion in the numerator is required by section 422(c)(3)(C) which provides, "stock which an individual may purchase under outstanding options shall be treated as stock owned by such individual." The Code contains no specific provision as to whether shares covered by options should be included in the denominator.

Section 422(b)(7) was added to the Code by the Revenue Act of 1964. Congress recognized that stock options provided an important incentive to key employees to improve the business of the corporation but it was unnecessary to provide such an incentive to a substantial shareholder because he already had a substantial stake in the business. H. Rept. 749, 88th Cong., 1st Sess. (1963), 1964–1 C.B. (Part 2) 189; S. Rept. 830, 88th Cong., 2d Sess. (1964), 1964–1 C.B. (Part 2) 594. The legislative history provides no insight into the intent of Congress as to the problem here involved.

The language of section 422(c)(3)(C), quoted above, treats stock which may be purchased by exercising an option as being owned by the individual. If such stock were owned by the individual it would be issued and outstanding. In addition, the ending language of section 422(c)(3)(C) which provides—

If an individual is granted an option which permits him to purchase stock in excess of the limitation of subsection (b)(7) (determined by applying the rules of this paragraph), such option shall be treated as meeting the requirement of subsection (b)(7) to the extent that such individual could, if the option were fully exercised at the time of grant, purchase stock under such option without exceeding such limitation. The portion of such option which is treated as

meeting the requirement of subsection (b)(7) shall be deemed to be that portion of the option which is first exercised * * *

is cast in terms of the option being fully exercised at the time of the grant. Such stock would, in that event, be issued and outstanding. We conclude, first, from the plain meaning of the statute, that shares covered by options should be included in the denominator as well as the numerator. Second, on the basis of sheer logic, we conclude that the stock covered by options must be included in the denominator. Inclusion of the optioned shares is a hypothetical to ascertain control. It must be based upon the assumption that the individual may exercise the option and purchase the stock. Inherent in that assumption is the inescapable fact that if the employee exercises the option and purchases the stock, it will be issued and outstanding stock. The Commissioner's position is contrary to the position he has taken in Rev. Rul. 68–601, 1968–2 C.B. 124, where he held that in applying the attribution rules under section 318(a) to a redemption under section 302(b)(2), warrants and debentures convertible into common stock are considered in both the numerator and denominator (as issued and outstanding) for purposes of ascertaining percentage of ownership of the outstanding stock of the corporation before and after the redemption. None of petitioners owned convertible debentures so we need not decide whether such ownership would constitute the ownership of options as were held for purposes of the attribution rules under section 318(a)(4) for redemption of stock purposes in Rev. Rul. 68–601, *supra*. We recognize that Congress provided separately for convertible securities and options in the personal holding company tax provisions. See sec. 544(a)(3) and sec. 544(b).

The Commissioner's position here is also contrary to a hypothetical we posed in a Court-reviewed opinion adopted without dissent. *Northwestern Steel & Supply Co. v. Commissioner*, 60 T.C. 356, 363 (1973).

We hold that section 1.422–2(h)(1)(ii), Income Tax Regs., wherein it holds that the aggregate voting power or value of all shares issued and outstanding does not include shares authorized for issue under outstanding options to the individual (for whom the formula is being applied) is contrary to the Code and, therefore, invalid. That portion of the regulations is unrealistic, unreasonable, and plainly inconsistent with the statute. *United States v. Cartwright*, 411 U.S. 546 (1973); *Joseph Weidenhoff, Inc.*

*v. Commissioner*, 32 T.C. 1222 (1959); *Parker Oil Co. v. Commissioner*, 58 T.C. 985 (1972); *Davis v. United States*, 460 F.2d 769 (9th Cir. 1972).

Petitioners' computations of the percentage of ownership are, therefore, approved. Table III on p. 1000 reflects the respective shares owned and deemed owned as determined pursuant to section 422(b)(7), the shares and options permissible under section 422(b)(7), and the portions of the options granted which represent compensation:

Petitioners concede that the excess of the fair market value of the stock over the option price on the dates that petitioners exercised options constitutes a preference item under section 57(a)(6) for purposes of the minimum tax imposed under section 56 of the Code.

## Issue 5. Stephen J. MacArthur Option

Stephen J. MacArthur, on January 11, 1968, was granted an option to purchase 6,200 shares of ISS stock, and on March 20, 1968, he executed an option agreement to purchase such shares. On October 23, 1969, he exercised his option in part and purchased 600 shares of stock. He died on June 21, 1970, and his wife, Judith A. MacArthur, was appointed executrix of his estate.

On April 15, 1971, Mrs. MacArthur, as executrix, borrowed $45,000 from ITEL (the successor of ISS) payable on or before April 15, 1975, and she pledged as collateral 5,060 shares of ITEL (formerly ISS) stock. On June 17, 1971, Mrs. MacArthur, as executrix, exercised the option of the estate to purchase 16,800 shares of ITEL stock (postsplit shares) for $25,586.40, and the consideration for the shares purchased was withheld from the proceeds of the loan made on April 15, 1971.

The stock option plan of ISS provided that payments for stock acquired by exercises of options would be in cash. The Commissioner, in his statutory notices of deficiency, determined that the stock purchased by the estate on June 17, 1971, was acquired by a promissory note which constituted a modification of the stock option under section 425(h). If the terms of an option are modified to provide more favorable terms to the optionee, the option is deemed to be granted on the date of modification. Sec. 1.425–1(e)(5)(i), Income Tax Regs.

Petitioners offered no evidence on this issue other than the

TABLE III

| Petitioner | Shares owned | Options granted on 3/14/68 | Options granted on 4/12/68 | Total shares deemed owned | Options and shares not compensation | Options representing compensation on 3/14/68 | Options representing compensation on 4/12/68 |
|---|---|---|---|---|---|---|---|
| *Options granted on Mar. 14, 1968* | | | | | | | |
| Brunner | 5,800 | 19,200 | | 25,000 | 22,920 | 2,080 | |
| Crouch | 5,800 | 19,200 | | 25,000 | 22,920 | 2,080 | |
| Harmon | 5,800 | 19,200 | | 25,000 | 22,920 | 2,080 | |
| Halfhill | 5,800 | 19,200 | | 25,000 | 22,920 | 2,080 | |
| Woo | 5,800 | 19,200 | | 25,000 | 22,920 | 2,080 | |
| *Options granted on Apr. 12, 1968* | | | | | | | |
| Brunner | 5,800 | 19,200 | 284 | 25,284 | 22,948 | | 2,336−2,080 = 256 |
| Crouch | 5,800 | 19,200 | 283 | 25,283 | 22,948 | | 2,335−2,080 = 255 |
| Harmon | 5,800 | 19,200 | 283 | 25,283 | 22,948 | | 2,335−2,080 = 255 |
| Halfhill | 5,800 | 19,200 | 283 | 25,283 | 22,948 | | 2,335−2,080 = 255 |
| Woo | 5,800 | 19,200 | 284 | 25,284 | 22,948 | | 2,336−2,080 = 256 |

legal instruments involved. The loan was made on April 15, 1971. If the estate borrowed money from ITEL for some purpose other than payment for the shares to be purchased pursuant to exercise of the option, it would seem that the $45,000 borrowed would be paid to the estate when the loan was made. The fact that ITEL, some 2 months after the loan was made, had in its possession at least $25,586.40 of the loan proceeds from which to collect for the purchase of the stock leads us to conclude that the loan was for the purchase of the stock pursuant to exercise of the option. There is no evidence in the record that ITEL ever paid the estate the remaining proceeds of the loan or evidence as to when the estate repaid the loan to ITEL.

Petitioners offered no testimony nor did they offer any explanation of the absence of testimony to explain the loan transaction. We can only conclude that such testimony, if offered, would be unfavorable. *Interstate Circuit v. United States*, 306 U.S. 208 (1939); *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Absent proof to the contrary, because payment for the stock was effected by loan proceeds, we must conclude that the loan was made for the purchase of the stock and such an arrangement would constitute a modification of the option on the date the loan was made, April 15, 1971. The Commissioner's determination on this issue is, therefore, sustained because petitioners have failed to overcome its presumptive correctness. We have found as a fact that the fair market value of the stock on April 15, 1971, exceeded the option price. Therefore, such option is not qualified.

*Decisions will be entered under Rule 155.*

Reviewed by the Court.